United States District Court – District Of Massachusetts
1 Courthouse Way
Boston, Massachusetts 02210


Attachment 1

Laurence Brown,
pro se Plaintiff

Civil Action
NO.

**v.**

Maura Healey, Attorney General
Of The Commonwealth Of Massachusetts

# COMPLAINT

### Parties

1.   The Plaintiff, Laurence Brown, resides in Bridgewater, Plymouth County, Massachusetts.

2.   Attorney General Maura Healey's address is One Ashburton Place, Boston, MA 02108-1518.

### Jurisdiction

3.   This court has jurisdiction over this matter pursuant to 28 U.S.C. §1331.

## Allegations - Statement Of Facts

### The Plaintiff

4.    I am a law abiding 71 year old retired senior citizen. I
have never been convicted of a crime. I have never shown
violence nor have I ever misused firearms. I have been involved
in most of the shooting sports, except hunting, for 58 years. I
became a NRA certified instructor and obtained a Certificate Of
Competency with firearms from the Commonwealth of Massachusetts
in 1962. I shoot handgun, shotgun, and rifle each week. Using
the words of the United States Court of Appeals for the Third
Circuit in United States v. Barton, 633 F.3d 174 (3d Cir. 2011)
I am "no more dangerous than a typical law-abiding citizen".

5.    Christopher Delmonte, the Bridgewater chief of police, has
stipulated that I had never been convicted of a crime, that I do
not have any disqualifiers on my record, and that I would be
eligible to obtain a firearms identification card, which I did.

6.    On 6/9/2017 I applied for renewal of my class A license to
carry firearms (LTC). Chief Christopher Delmonte denied my
application in a letter dated August 16, 2017, finding me to be
"an unsuitable person" to continue to hold his LTC.

## Massachusetts Firearms licensing Law

7.   In Massachusetts, in order to possess and carry firearms
you must be licensed. The licensing process has two parts. In
the first part records are examined to find out whether the
applicant is categorically prevented from possessing firearms
because of a criminal record or a record of mental illness. The
second part is a case by case discretionary review. Each
individual applicant must be a suitable person according to the
beliefs and prejudices of his or her police chief. This means a
possible 351 different licensing requirements. I could have my
license renewed if I moved, for example, to Brockton, West
Bridgewater, East Bridgewater, Plymouth, Avon, or Rockland.
However, I have resided in Bridgewater for 13 years and do not
want to move. It's actually worse then this because each town's
requirements can change with a change in police chief. That's
what happened in this case, an experienced police chief (38
years experience, ten years as chief) renewed my class A license
but an inexperienced police chief (first few months as chief)
refused to renew it. The very definition of arbitrary and
capricious! Moving your residence from one town to another can
be a nightmare for Massachusetts firearms owners. Different
licensing requirements in different towns violates the equal
protection (equal justice) clause of the Fourteenth Amendment as
well as the Second Amendment.

3

8.    For example, Fred Bever of wbur radio in Boston wrote the
following article:

*In Mass.Gun Permit Standards Vary By Location*
*Varied Standards*

9.    *David Martineau, deputy chief at the police department in*
*the small town of Avon, says there are some basics to getting an*
*unrestricted Class A gun license in his community: You must*
*complete a certified gun safety course, pay a $100 fee, provide*
*fingerprints and submit two letters of reference attesting to*
*your suitability to own firearms.*

10.    *"Just that you're a standup guy and they have no*
*reservations about you having a gun," Martineau explained.*

11.    *An unrestricted Class A license is the broadest of three*
*types available under state law. It allows a resident to have*
*rifles, shotguns and large-capacity handguns.*

12.    *State and federal law can bar firearm ownership on several*
*grounds. Those exclusions include, for instance, any conviction*
*on charges that carry maximum penalties of two years or more, or*
*an involuntary commitment to a mental institution.*

13.    *But other than the specific statutory prohibitions,*
*Martineau says, determination of an Avon resident's suitability*
*to own a handgun is really his call.*

14.  *"I'm pretty lenient," he said. "I figure statutorily if you're allowed to have it, who am I?"*

15.  *But if there are doubts about someone's history, licensing authorities such as Martineau may consult arresting officers, victims, family and friends.*

16.  *Deputy Chief Martineau may be lenient as a matter of course, but some of his colleagues are not. Some police departments don't make any checks beyond the statutory exclusions. In others, they won't even consider an unrestricted license for a first-time gun owner.*

17.  In several cases, similar in that <u>whether an applicant received a LTC or not was solely determined by venue</u>, (In both RICHMOND v. PERAINO and WESSON ET. AL. v. TOWN OF SALISBURY(U.S. DISTRICT COURT DISTRICT OF MA)) "the Commonwealth acknowledged that it could not argue that the disqualification was "'substantially related' to an interest in preserving public safety and preventing crime"".

18.  RICHMOND v. PERAINO: ...the First Circuit has held that "a categorical ban on gun ownership by a class of individuals must be supported by some form of 'strong showing,' necessitating a substantial relationship between the restriction and an important governmental objective."

19.   Accordingly, in Wesson, the Commonwealth conceded that had

the plaintiffs been convicted in Massachusetts of simple

possession of an ounce or less of marijuana, rather than having

been convicted of that offense outside of the Commonwealth, they

would in all likelihood not have been subject to the statutory

exclusion from obtaining an LTC or PTP. Because other

individuals who had substantially identical convictions could

otherwise be considered for and receive an LTC, the Commonwealth

acknowledged that it could not argue that the disqualification

was "'substantially related' to an interest in preserving public

safety and preventing crime" and thus "d[id] not oppose a

narrowly drawn declaratory judgment" that the statutory

exclusions contained in ch. 140, §§ 131(d)(i)(E) and 131A

infringed on the plaintiffs' "Second Amendment right to possess

firearms in the home for self-defense."

20.   Furthermore, Massachusetts has three types of licenses, a

class A license to carry, a class B license to carry, and a

firearms identification card (FID card), each type has different

restrictions but the same qualifications. This is another case

by case discretionary review by the police chief. Only the class

A license to carry allows the license holder the ability to

fully utilize his or her Second Amendment rights. Since all

license applicants are subject to the same Second Amendment

rights and categorical restrictions on licensing, and only the

class A license to carry allows the license holder the ability to fully utilize his or her Second Amendment rights, having three types of license is unconstitutional under the Second Amendment and also the Fourteenth Amendment. Clearly, there are not three types of citizens, each with different constitutional rights and categorical restrictions on licensing.

21. Davis v. Grimes (U.S. DISTRICT COURT DISTRICT OF MA) challenged the <u>wide-spread practice of restricting the lawful possession, use, and carrying of firearms in such a way as to deny plaintiffs the ability to use or carry a firearm for personal protection.</u>

22. The lawsuit sought a declaratory ruling that the Massachusetts statute and the practice of the defendants is unconstitutional as it denies otherwise qualified citizens the ability to possess or carry an operable firearm for the purpose of personal protection.

23. Both defendant's, Peabody and Weymouth, have changed their licensing policies and now routinely issue unrestricted class A licenses to carry to qualified applicants.

24. From the court's order: *In accordance with the Court's Electronic Order issued on June 17, 2015, granting the defendant's Motion to Dismiss on the Ground That There is no Longer a Case or Controversy Between the Parties, it is hereby ORDERED that the above-entitled action be dismissed.*

7

### Federal Court Rulings Clarifying The Second Amendment

25. After some initial confusion as to how to handle Second Amendment cases, the federal court system has reached a consensus. The following is a compilation of relevant Supreme Court, Federal Appeals Court, and District court decisions.

## DISTRICT OF COLUMBIA ET AL. v. HELLER
## U.S. SUPREME COURT

26. There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms.

27. the right secured...was by the time of the founding understood to be an individual right protecting against both public and private violence.

28. The Second Amendment protects an individual right to possess a firearm unconnected with service in a militia, and to use that arm for traditionally lawful purposes, such as self-defense within the home.

29. The handgun ban... violate the Second Amendment. The District's total ban on handgun possession in the home amounts to a prohibition on an entire class of "arms" that Americans overwhelmingly choose for the lawful purpose of self-defense. Under any of the standards of scrutiny the Court has applied to enumerated constitutional rights, this prohibition—in the place where the importance of the lawful defense of self, family, and

property is most acute—would fail constitutional muster. ... and
is hence unconstitutional.

30.     In *Muscarello* v. *United States*, 524 U. S. 125 (1998), in
the course of analyzing the meaning of "carries a firearm" in a
federal criminal statute, JUSTICE GINSBURG wrote that "[s]urely
a most familiar meaning is, as the Constitution's Second
Amendment . . . indicate[s]: 'wear, bear, or carry . . . upon
the person or in the clothing or in a pocket, for the purpose .
. . of being armed and ready for offensive or defensive action
in a case of conflict with another person. We think that JUSTICE
GINSBURG accurately captured the natural meaning of "bear arms".
31.     Meaning of the Operative Clause. Putting all of these
textual elements together, we find that they guarantee the
individual right to possess and carry weapons in case of
confrontation.

32.     As the quotations earlier in this opinion demonstrate, the
inherent right of self-defense has been central to the Second
Amendment right. The handgun ban amounts to a prohibition of an
entire class of "arms" that is overwhelmingly chosen by American
society for that lawful purpose. The prohibition extends,
moreover, to the home, where the need for defense of self,
family, and property is most acute. Under any of the standards
of scrutiny that we have applied to enumerated constitutional
rights, banning from the home "the most preferred firearm in the

nation to 'keep' and use for protection of one's home and family," would fail constitutional muster.

33.   ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional").It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon.

34.   Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.

35.   We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes)

**10**

even future judges think that scope too broad. We would not apply an "interest-balancing" approach to the prohibition of a peaceful neo-Nazi march through Skokie. The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong-headed views. The Second Amendment is no different. Like the First, it is the very *product* of an interest-balancing by the people—which JUSTICE BREYER would now conduct for them anew. And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.

36.    If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant...

37.    In sum, we hold that the District's ban on handgun possession in the home violates the Second Amendment...

38.    But the enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of handguns held and used for self-defense in the home.

ILLINOIS ASSOCIATION OF FIREARMS RETAILERS v. CITY OF
CHICAGO U. S. DISTRICT COURT FOR THE NORTHERN DISTRICT
OF ILLINOIS EASTERN DIVISION

39.    certain fundamental rights are protected by the
Constitution, put outside government's reach, including the
right to keep and bear arms for self-defense under the Second
Amendment.

40.    *Moore* reiterates that the level of scrutiny during the
second-step means-end analysis varies according to the breadth
of the challenged Second Amendment restriction

41.    the State needed to make an extremely strong showing that
its law furthered public safety.

42.    so substantial a curtailment of the right of armed self-
defense requires a greater showing of justification than merely
that the public *might* benefit on balance from such a
curtailment, though there is no proof it would.

44.    *Moore* reasoned that the State had to make a stronger
empirical showing that its gun ban was vital to public safety
than the federal government had to in *United States v. Skoien*,
614 F.3d 638 (7th Cir. 2010) (en banc). There, the government
successfully justified a federal law that forbids convicted
domestic-violence misdemeanants from possessing firearms. *Id.* at
639, 645.

45.    To carry its burden, the City must establish a "close fit"
between the sales-and-transfer ban and the actual public
interests it serves, and prove that the public's interests are

**12**

strong enough to justify "so substantial an encumbrance on
individual Second Amendment rights.

## MICHAEL MOORE, *ET. AL.*, and MARY E. SHEPARD, *et al.* v. LISA MADIGAN, ATT. GEN. OF ILL., *et al.* U. S. Court Of Appeals For The Seventh Circuit

46.    The appellees ask us to repudiate the Court's historical
analysis. That we can't do. Nor can we ignore the implication of
the analysis that the constitutional right of armed self-defense
is broader than the right to have a gun in one's home.

47.    *Heller* repeatedly invokes a broader Second Amendment right
than the right to have a gun in one's home, as when it says that
the amendment "guarantee[s] the individual right to possess and
carry weapons in case of confrontation." 554 U.S. at 592.
Confrontations are not limited to the home.

48.    The Second Amendment states in its entirety that "a well
regulated Militia, being necessary to the security of a free
State, the right of the people to keep *and bear* Arms, shall not
be infringed" (emphasis added). The right to "bear" as distinct
from the right to "keep" arms is unlikely to refer to the home.
To speak of "bearing" arms within one's home would at all times
have been an awkward usage. A right to bear arms thus implies a
right to carry a loaded gun outside the home.

49.    To confine the right to be armed to the home is to divorce
the Second Amendment from the right of self-defense described in
*Heller* and *McDonald*.

**13**

50.    The available data about permit holders also imply that
they are at fairly low risk of misusing guns, consistent with
the relatively low arrest rates observed to date for permit
holders. Based on available empirical data, therefore, we expect
relatively little public safety impact

51.    Moreover, violent crime in the United States has been
falling for many years...

www.themonkeycage.org/blog/2012/07/21/thedeclining-

culture-of-guns-and-violence-in-the-unitedstates (visited Oct.
29, 2012); see also Tom W. Smith, "Public Attitudes Towards the
Regulation of Firearms" (University of Chicago Nat'l Opinion
Research Center , Mar. 2007),http://icpgv.org/pdf/NOR
CPoll.pdf(visited Oct.29,2012)—in the same period in which gun
laws have become more permissive.

52.    Anyway the Supreme Court made clear in *Heller* that it
wasn't going to make the right to bear arms depend on casualty
counts.

53.    In *Skoien* we said that the government had to make a
"strong showing" that a gun ban was vital to public safety—it
was not enough that the ban was "rational." 614 F.3d

54.    A blanket prohibition on carrying gun in public prevents a
person from defending himself anywhere except inside his home;
and so substantial a curtailment of the right of armed self-
defense requires a greater showing of justification than merely

**14**

that the public *might* benefit on balance from such a
curtailment, though there is no proof it would.

## TOM G. PALMER ET. AL. v. DISTRICT OF COLUMBIA and CATHY LANIER U. S. DISTRICT COURT – DISTRICT OF COLUMBIA

55.    Furthermore, as the court in *Peruta* correctly pointed out,
"with *Heller* on the books, the Second Amendment's original
meaning is now settled in at least two relevant respects."
*Peruta*, 742 F.3d at 1155. "First, *Heller* clarifies that the
keeping and bearing of arms is, *and has always been*, an
individual right. *Id.* (citing [*Heller*], 554 U.S. at 616, 128 S.
Ct. 2783). "Second, the right is, *and has always been*, oriented
to the end of self-defense."

56.    After an exhaustive summary of the text and history of the
Second Amendment, the Ninth Circuit in *Peruta* concluded that
"the carrying of an operable handgun outside the home for the
lawful purpose of self-defense, though subject to traditional
restrictions, constitutes 'bear[ing] Arms' within the meaning of
the Second Amendment." *Peruta*, 742 F.3d at 1166. As the Ninth
Circuit noted, this conclusion is not surprising in light of the
fact that other circuits have reached the same result. *See id.*
(citing *Moore*, 702 F.3d at 936 ("A right to bear arms thus
implies a right to carry a loaded gun outside the home.");
*Drake*, 724 F.3d at 431 (recognizing that the Second Amendment
right "*may* have some application beyond the home"); *Woollard v.
Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013) ("We . . . assume

**15**

that the *Heller* right exists outside the home. . . .");

*Kachalsky*, 701 F.3d at 89 (assuming that the Second Amendment "must have *some* application in the very different context of the public possession of firearms")). This Court, joining with most of the other courts that have addressed this issue, reaches this same conclusion.

57.    Finally, as the *Peruta* court pointed out, "[understanding the scope of the right is not just necessary, it is key to [the court's] analysis [because,] if self-defense outside the home is part of the core right to 'bear arms' and the [District of Columbia's] regulatory scheme prohibits the exercise of that right, no amount of interest-balancing under a heightened form of means-end scrutiny can justify [the District of Columbia's] policy." *Id.* at 1167 (citing *Heller*, 554 U.S. at 634, 128 S. Ct. 2783 ("The very enumeration of the right takes out of the hands of government even the Third Branch of Government the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.")

58.    In light of *Heller, McDonald*, and their progeny, there is no longer any basis on which this Court can conclude that the District of Columbia's total ban on the public carrying of ready to use handguns outside the home is constitutional under any level of scrutiny.

59.    BELLEVUE, Wash., Nov. 7, 2014 /PRNewswire-USNewswire/ --
The U.S. District Court for the District of Columbia has denied

a motion by the District to reconsider its ruling in the case
of *Palmer v. District of Columbia*, a Second Amendment Foundation
case that nullified the city's ban on carrying firearms outside
of the home.

## EDWARD PERUTA ET. AL. v. COUNTY OF SAN DIEGO ET.AL. U. S. COURT OF APPEALS FOR THE NINTH CIRCUIT (also ADAM RICHARDS v. ED PRIETO)

60.   California law delegates to each city and county the power
to issue a written policy setting forth the procedures for
obtaining a concealed-carry license. *Id.* §26160. San Diego
County has issued such a policy. At issue in this appeal is that
policy's interpretation of the "good cause" requirement…..Good
cause is "evaluated on an individual basis"

61.   As in the district court, on appeal the applicants place
one argument at center stage: they assert that by defining "good
cause" in San Diego County's permitting scheme to exclude a
general desire to carry for self-defense, the County
impermissibly burdens their Second Amendment right to bear arms.

62.   *Heller* and *McDonald* Courts were hardly shy: we must
consult "both text and history." *Heller*, 554 U.S. at 595; *see
also McDonald*, 130 S. Ct. at 3047(reiterating that "the scope of
the Second Amendment right" is determined by historical analysis
and not interest balancing).

63.   The Second Amendment secures the right not only to "keep"
arms but also to "*bear*" them—the verb whose original meaning is
key in this case. Saving us the trouble of pulling the

eighteenth-century dictionaries ourselves, the Court already has supplied the word's plain meaning: "At the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 554 U.S. at 584.3 Yet, not "carry" in the ordinary sense of "convey[ing] or transport[ing]" an object, as one might carry groceries to the check-out counter or garments to the laundromat, but "carry for a particular purpose—confrontation." *Id.* The "natural meaning of 'bear arms,' "according to the *Heller* majority, was best articulated by Justice Ginsburg in her dissenting opinion in *Muscarello v. United States*, 524 U.S. 125 (1998): to "'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose. . . of being armed and ready for offensive or defensive action in a case of conflict with another person.'"

64.     Speakers of the English language will all agree: "bearing a weapon inside the home" does not exhaust this definition of "carry." For one thing, the very risk occasioning such carriage, "confrontation," is "not limited to the home." *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012). One needn't point to statistics to recognize that the prospect of conflict—at least, the sort of conflict for which one would wish to be "armed and ready"—is just as menacing (and likely more so) beyond the front porch as it is in the living room. For that reason, "[t]o speak of 'bearing' arms within one's home would at all times have been an awkward usage." *Id.* To be sure, the idea of carrying a gun

**18**

"in the clothing or in a pocket, for the purpose . . . of being armed and ready," does not exactly conjure up images of father stuffing a six-shooter in his pajama's pocket before heading downstairs to start the morning's coffee, or mother concealing a handgun in her coat before stepping outside to retrieve the mail. Instead, it brings to mind scenes such as a woman toting a small handgun in her purse as she walks through a dangerous neighborhood, or a night-shift worker carrying a handgun in his coat as he travels to and from his job site. More importantly, at the time of the Second Amendment's enactment, the familiar image that "bear arms" would have painted is one of an eighteenth-century frontiersman, who "from time to time [would] leave [his] home to obtain supplies from the nearest trading post, and en route one would be as much (probably more) at risk if unarmed as one would be in one's home unarmed." *Id.* at 936. Indeed, it was this spirit of the arms-bearing settler that Senator Charles Sumner invoked (and the *Heller* Court cited as instructive of the scope of the right) in the (in)famous "Crime against Kansas" speech in 1856: "The rifle has ever been the companion of the pioneer and, under God, his tutelary protector against the red man and the beast of the forest. Never was this efficient weapon more needed in just self-defense, than now in Kansas, and at least one article in our National Constitution must be blotted out, before the complete right to it can in any way be impeached." 4 *The Works of Charles Sumner* 211-12 (1875);

*see also Heller*, 554 U.S. at 609. Other passages in *Heller* and *McDonald* suggest that the Court shares Sumner's view of the scope of the right. The Second Amendment, *Heller* tells us, secures "the right to 'protect oneself against both *public* and private violence, ' thus extending the right in some form to wherever a person could become exposed to public or private violence." *United States v. Masciandaro,* 638 F.3d 458, 467

65.     (4th Cir. 2011) (Niemeyer, J., specially concurring) (quoting *Heller*, 554 U.S. at 594 (emphasis added)). The Court reinforced this view by clarifying that the need for the right is "most acute" in the home, *Heller*, 554 U.S. at 628, thus implying that the right exists outside the home...

66.     both *Heller* and *McDonald* identify the "core component" of the right as self-defense, which necessarily "take[s] place wherever [a] person happens to be," whether in a back alley or on the back deck.

67.     ("To confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald*.").

68.     the Second Amendment right "could not rationally have been limited to the home." *Moore*, 702 F.3d at 936. Though people may "keep Arms" (or, per *Heller*'s definition, "have weapons," 554 U.S. at 582) in the home for defense of self, family, and property, they are more sensibly said to "bear Arms" (or, *Heller*'s gloss: "carry [weapons] . . . upon the person or in the

clothing or in a pocket," *id.* at 584) in *nondomestic* settings.4
*Kachalsky*, 701 F.3d at 89 n.10 ("The plain text of the Second
Amendment does not limit the right to bear arms to the home.");
*see also Drake v. Filko*, 724 F.3d 426, 444 (3d Cir.2013)
(Hardiman, J., dissenting) ("To speak of 'bearing' arms solely
within one's home not only would conflate 'bearing' with
'keeping,' in derogation of the Court's holding that the verbs
codified distinct rights, but also would be awkward usage given
the meaning assigned the terms by the Supreme Court.").

69.    many of the same cases that the *Heller* majority invoked as
proof that the Second Amendment secures an individual right may
just as easily be cited for the proposition that the right to
carry in case of confrontation means nothing if not the general
right to carry a common weapon outside the home for self-
defense.

70.    Our conclusion that the right to bear arms includes the
right to carry an operable firearm outside the home for the
lawful purpose of self-defense is perhaps unsurprising—other
circuits faced with this question have expressly held, or at the
very least have assumed, that this is so.

71.    "[C]onstitutional rights are enshrined with the scope they
were understood to have when the people adopted them. . . ." *Id.*
at 634-35. A law that "under the pretense of regulating, amounts
to a destruction of the right" would not pass constitutional
muster "[u]nder any of the standards of scrutiny that we have

applied to enumerated constitutional rights." *Id.* at 628—29. Put simply, a law that destroys (rather than merely burdens) a right central to the Second Amendment must be struck down. *Id.*

72.   712 F.3d at 876; *Kachalsky*, 701 F.3d at 89; *cf.* *Masciandaro*, 638 F.3d at 475. Understanding the scope of the right is not just necessary, it is key to our analysis. For if self-defense outside the home is part of the core right to "bear arms" and the California regulatory scheme prohibits the exercise of that right, no amount of interest-balancing under a heightened form of means-ends scrutiny can justify San Diego County's policy. *See Heller*, 554 U.S. at 634 ("The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.").

73.   To determine what constitutes an infringement, our sister circuits have grappled with varying sliding-scale and tiered-scrutiny approaches, agreeing as a general matter that "the level of scrutiny applied to gun control regulations depends on the regulation's burden on the Second Amendment right to keep and bear arms." *Nordkye v. King*, 681 F.3d 1041, 1045—46 (9th Cir. 2012) (en banc) (O'Scannlain, J., concurring) (collecting cases); *see Heller II*, 670 F.3d at 1257 (requiring a "strong justification" for regulations imposing a "substantial burden upon the core right of self-defense"); *Ezell*, 651 F.3d at 706,

708 (applying more demanding scrutiny to "severe burden[s] on
the core Second Amendment right"); *Masciandaro*, 638 F.3d at 469-
70 (requiring "strong justification[s]" for "severe burden[s] on
the core Second Amendment right" (quoting *Chester*, 628 F.3d at
682-83)); *Marzzarella*, 614 F.3d at 97 (calibrating the level of
scrutiny to the "severity" of the burden imposed). Under this
general approach, severe restrictions on the "core" right have
been thought to trigger a kind of strict scrutiny,

74.    A law effecting a "*destruction* of the right" rather than
merely *burdening* it is, after all, an infringement under any
light. *Heller*, 554 U.S. at 629 (emphasis added) (quoting *Reid*, 1
Ala. at 616-17); *see also Heller II*, 670 F.3d at 1271 ("In my
view, *Heller* and *McDonald* leave little doubt that courts are to
assess gun bans and regulations based on text, history, and
tradition, not by a balancing test such as strict or
intermediate scrutiny.").

75.    Intermediate scrutiny is not appropriate, however, for
cases involving the destruction of a right at the core of the
Second Amendment.

76.    Because the Second Amendment "confer[s] an individual
right to keep and bear arms," we must assess whether the
California scheme deprives any individual of his constitutional
rights. *Heller*, 554 U.S. at 595. Thus, the question is not
whether the California scheme (in light of San Diego County's
policy) allows *some* people to bear arms outside the home in *some*

places at *some* times; instead, the question is whether it allows the typical responsible, law-abiding citizen to bear arms in public for the lawful purpose of self-defense. The answer to the latter question is a resounding "no."

65.    the Second Amendment does require that the states permit *some form* of carry for self-defense outside the home.

77.    But so far as it cuts off the exercise of the right of the citizen altogether to *bear arms*, *or*, under the color of prescribing the *mode*, renders the right itself useless—it is in conflict with the Constitution, and *void*." 1 Ga. at 243.

78.    We are unpersuaded by the decisions of the Second, Third, and Fourth Circuits for several reasons. First, contrary to the approach in *Heller*, all three courts declined to undertake a complete historical analysis of the scope and nature of the Second Amendment right outside the home….. Amendment"). As a result, they misapprehend both the nature of the Second Amendment right and the implications of state laws that prevent the vast majority of responsible, law-abiding citizens from carrying in public for lawful self-defense purposes.

79.    And with these cases off the table, the remaining cases speak with one voice: states may not destroy the right to bear arms in public under the guise of regulating it.

80.    By evading an in-depth analysis of history and tradition, the Second, Third, and Fourth Circuits missed a crucial piece of the Second Amendment analysis. They failed to comprehend that

carrying weapons in public for the lawful purpose of self
defense is a central component of the right to bear arms.
81.    regulations on the right, although permissible to an
extent, could not go so far as to enjoin completely a
responsible, law-abiding citizen's right to carry in public for
self-defense. Such regulations affecting a destruction of the
right to *bear arms*, just like regulations that affect a
destruction of the right to *keep arms*, cannot be sustained under
any standard of scrutiny

82.    Because the Second, Third, and Fourth Circuits eschewed
history and tradition in their analysis of the constitutionality
of these regulations, despite the Supreme Court's admonition
that "the public understanding of a legal text in the period
after its enactment or ratification" is a "critical tool of
constitutional interpretation," we find their approaches
unpersuasive.

83.    the analysis in the Second, Third, and Fourth Circuit
decisions is near-identical to the freestanding "interest-
balancing inquiry" that Justice Breyer proposed—and that the
majority explicitly rejected—in *Heller*…..As we previously
explained, such an approach ignores the *Heller* court's
admonition that "the very enumeration of the right takes out of
the hands of government . . . the power to decide on a case-by-
case basis whether the right is *really worth* insisting upon."

84.    it is not the role of this Court [or ours] to pronounce
the Second Amendment extinct." *Id.* at 636. Nor may we relegate
the bearing of arms to a "second-class right, subject to an
entirely different body of rules than the other Bill of Rights
guarantees that we have held to be incorporated into the Due
Process Clause."

85.    San Diego County's "good cause" permitting requirement
impermissibly infringes on the Second Amendment right to bear
arms in lawful self-defense.

86.    Yolo County's policy...abridges the Second Amendment right
to bear arms because its definition of "good cause" prevents a
responsible, law-abiding citizen from carrying a handgun in
public for the lawful purpose of self-defense.

### RHONDA EZELL, ET. AL. v. CITY OF CHICAGO
### United States Court Of Appeals,Seventh Circuit

87.    This reasoning assumes that the harm to a constitutional
right is measured by the extent to which it can be exercised in
another jurisdiction. That's a profoundly mistaken assumption.
In the First Amendment context, the Supreme Court long ago made
it clear that " 'one is not to have the exercise of his liberty
of expression in appropriate places abridged on the plea that it
may be exercised in some other place.' " Schad v. Borough of Mt.
Ephraim, 452 U.S. 61, 76-77, 101 S.Ct. 2176, 68 L.Ed.2d 671
(1981) (quoting Schneider v. State of New Jersey, 308 U.S. 147,
163, 60 S.Ct. 146, 84 L.Ed. 155 (1939)). The same principle

applies here. It's hard to imagine anyone suggesting that
Chicago may prohibit the exercise of a free speech or religious-
liberty right within its borders on the rationale that those
rights may be freely enjoyed in the suburbs. That sort of
argument should be no less unimaginable in the Second Amendment
context.

88.    Beyond this crucial point about the form of the claim, for
some kinds of constitutional violations, irreparable harm is
presumed. See 11A Charles Alan Wright et al., Federal Practice &
Procedure § 2948.1 (2d ed. 1995) ("When an alleged deprivation
of a constitutional right is involved, most courts hold that no
further showing of irreparable injury is necessary."). This is
particularly true in First Amendment claims. See, e.g.,
Christian Legal Soc'y, 453 F.3d at 867 ("[V]iolations of First
Amendment rights are presumed to constitute irreparable injuries
"(citing Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49
L.Ed.2d 547 (1976))). The loss of a First Amendment right is
frequently presumed to cause irreparable harm based on "the
intangible nature of the benefits flowing from the exercise of
those rights; and the fear that, if those rights are not
jealously safeguarded, persons will be deterred, even if
imperceptibly, from exercising those rights in the future."
Miles Christi Religious Order v. Twp. of Northville, 629 F.3d
533, 548 (6th Cir.2010) (internal alteration and quotation marks
omitted); see also KH Outdoor, LLC v. City of Trussville, 458

F.3d 1261, 1272 (11th Cir.2006). The Second Amendment protects similarly intangible and unquantifiable interests. Heller held that the Amendment's central component is the right to possess firearms for protection. 554 U.S. at 592-95. Infringements of this right cannot be compensated by damages.

89. Heller, McDonald, and a framework for Second Amendment litigation..... Heller focused almost exclusively on the original public meaning of the Second Amendment, consulting the text and relevant historical materials to determine how the Amendment was understood at the time of ratification. This inquiry led the Court to conclude that the Second Amendment secures a pre-existing natural right to keep and bear arms; that the right is personal and not limited to militia service; and that the "central component of the right" is the right of armed self-defense, most notably in the home.

90. we know that Heller's reference to "any standard of scrutiny" means any heightened standard of scrutiny; the Court specifically excluded rational-basis review. Id. at 628-29 & n. 27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."); see also Skoien, 614 F.3d at 641 ("If a rational basis were enough [to justify a firearms law], the Second Amendment would not do anything

because a rational basis is essential for legislation in
general.")

91.    "The scope of the Second Amendment right" is determined by
textual and historical inquiry, not interest-balancing.).

92.    The Supreme Court's free-speech jurisprudence contains a
parallel for this kind of threshold "scope" inquiry. The Court
has long recognized that certain "well-defined and narrowly
limited classes of speech"—e.g., obscenity, defamation, fraud,
incitement—are categorically "outside the reach" of the First
Amendment. United States v. Stevens, U.S.     , 130 S.Ct. 1577,
1584-85, 176 L.Ed.2d 435 (2010); see also Brown v. Entm't
Merchants Ass'n, No. 08-1448,2011 WL 2518809, at *3-4 (June 27,
2011). When the Court has "identified categories of speech as
fully outside the protection of the First Amendment, it has not
been on the basis of a simple cost-benefit analysis." Stevens,
130 S.Ct. at 1586. Instead, some categories of speech are
unprotected as a matter of history and legal tradition. Id. So
too with the Second Amendment.

93.    the rigor of this judicial review will depend on how close
the law comes to the core of the Second Amendment right and the
severity of the law's burden on the right.

94.    Both Heller and McDonald suggest that broadly prohibitory
laws restricting the core Second Amendment right—like the
handgun bans at issue in those cases, which prohibited handgun
possession even in the home—are categorically unconstitutional.

Heller, 554 U.S. at 628-35 ("We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach."); McDonald, 130 S.Ct. at 3047-48.

95.    Both Heller and McDonald suggest that First Amendment analogues are more appropriate, see Heller, 554 U.S. at 582, 595, 635; McDonald, 130 S.Ct. at 3045, and on the strength of that suggestion, we and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context, see Skoien, 614 F.3d at 641; id. at 649 (Sykes, J., dissenting); Chester, 628 F.3d at 682; Marzzarella, 614 F.3d at 89 n. 4; see also Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense, 56 UCLA L.Rev. at 1449, 1452, 1454-55; Lund, The Second Amendment, Heller, and Originalist Jurisprudence, 56 UCLA L.Rev. at 1376; Winkler, Heller's Catch-22, 56 UCLA L.Rev. at 1572.

96.    In free-speech cases, the applicable standard of judicial review depends on the nature and degree of the governmental burden on the First Amendment right and sometimes also on the specific iteration of the right…. laws imposing severe burdens get strict scrutiny

97.    We can distill this First Amendment doctrine and extrapolate a few general principles to the Second Amendment context. First, a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong

public-interest justification and a close fit between the
government's means and its end.

98.     The City must establish a close fit between the range ban
and the actual public interests it serves, and also that the
public's interests are strong enough to justify so substantial
an encumbrance on individual Second Amendment rights. Stated
differently, the City must demonstrate that civilian target
practice at a firing range creates such genuine and serious
risks to public safety that prohibiting range training
throughout the city is justified.

99.     At this stage of the proceedings, the City has not come
close to satisfying this standard. In the district court, the
City presented no data or expert opinion to support the range
ban, so we have no way to evaluate the seriousness of its
claimed public-safety concerns. Indeed, on this record those
concerns are entirely speculative

100.    The City maintains that firing ranges create the risk of
accidental death or injury and attract thieves wanting to steal
firearms. But it produced no evidence to establish that these
are realistic concerns, much less that they warrant a total
prohibition on firing ranges. In the First Amendment context,
the government must supply actual, reliable evidence to justify
restricting protected expression based on secondary public-
safety effects.

31

## CHRISTOPHER M. FLETCHER ET. AL. v. ROBERT C. HAAS
## Et.Al. U. S. DISTRICT COURT DISTRICT OF MA

101.  As the Fourth Circuit has explained: The Second Amendment
is no more susceptible to a one-size-fits-all standard of review
than any other constitutional right. Gun-control regulations
impose varying degrees of burden on Second Amendment rights, and
individual assertions of the right will come in many forms. A
severe burden on the core Second Amendment right of armed self-
defense should require strong justification.

102.  Nevertheless, *Heller* expressly ruled out applying rational
basis review to laws encroaching upon the Second Amendment right
to bear arms. 554 U.S. at 628 n.27.

103.  Nevertheless, it has been recognized that "any law that
would burden the 'fundamental,' core right of self-defense in
the *home* by a *law-abiding* citizen would be subject to strict
scrutiny." *Masciandro*, 638 F.3d at 470 (emphasis added).

104.  The threshold inquiry is whether the absolute prohibition
on handgun possession by Fletcher and Pryal, who are lawful
permanent residents, falls within the scope of the Second
Amendment.

105.  The Massachusetts firearms regulatory regime, as applied
to Fletcher and Pryal, does not pass constitutional muster

106.  Defendants argue that Massachusetts has a compelling
interest in limiting the proliferation of firearms because of
their inherent danger. But Defendants fail to establish that the

statute is either substantially related to, or narrowly tailored
to serve, this interest in a constitutional fashion.

107.   The possibility that some resident aliens are unsuited to
possess a handgun does not justify a wholesale ban.

## MCDONALD ET AL. v. CITY OF CHICAGO, ILLINOIS, ET AL.
### SUPREME COURT OF THE UNITED STATES

108.   In *Heller*, however, we expressly rejected the argument
that the scope of the Second Amendment right should be
determined by judicial interest balancing,

109.   *Heller* points unmistakably to the answer. Self-defense is
a basic right, recognized by many legal systems from ancient
times to the present, and the *Heller* Court held that individual
self-defense is "the central component" of the Second Amendment
right.

110.   It thus concluded that citizens must be permitted "to use
handguns for the core lawful purpose of self-defense." *Heller*
also clarifies that this right is "deeply rooted in this
Nation's history and traditions,"

111.   In *Snyder* v. *Massachusetts*, 291 U. S. 97, 105 (1934), the
Court spoke of rights that are "so rooted in the traditions and
conscience of our people as to be ranked as fundamental." And in
*Palko*, the Court famously said that due process protects those
rights that are "the very essence of a scheme of ordered
liberty" and essential to "a fair and enlightened system of
justice." 302 U. S., at 325.

112.    In sum, it is clear that the Framers and ratifiers of the
Fourteenth Amendment counted the right to keep and bear arms
among those fundamental rights necessary to our system of
ordered liberty.

## WESSON ET. AL. v. TOWN OF SALISBURY ET. AL. U. S. DISTRICT COURT DISTRICT OF MASSACHUSETTS

113.    The Second Amendment, on the other hand, "codifies a
'right of the people'" as individuals "to possess and carry
weapons in case of confrontation" in the defense of "hearth and
home." Dist. of Columbia v. Heller, 554 U.S. 570, 579, 592, 599
(2008)

114.    In deciding that the right to bear arms is "fundamental
to our scheme of ordered liberty" and is "deeply rooted in this
Nation's history and tradition," Justice Alito found this to be
especially true of handguns "because they are the 'the most
preferred firearm in the nation . . . for protection of one's
home and family.'" Id. at 3036 (HELLER & MCDONALD)

## CLIFFORD TYLER v. HILLSDALE COUNTY SHERIFF'S DEPT., U. S. APPEALS COURT FOR THE 6th CIRCUIT

115.    There are strong reasons for preferring strict scrutiny
over intermediate scrutiny. First, the Supreme Court has by now
been clear and emphatic that the "right to keep and bear arms"
is a "fundamental right necessary to our system of ordered
liberty." McDonald, 561 U.S. at 778. In our view, that strong

language suggests that restrictions on that right trigger strict
scrutiny.

116.    Although it is true that strict scrutiny is not always
implicated when a fundamental right is at stake, the Supreme
Court has suggested that there is a presumption in favor of
strict scrutiny when a fundamental right is involved.

117.    another reason for preferring strict scrutiny is that the
courts of appeals originally adapted the levels of scrutiny of
Second Amendment jurisprudence by looking to First Amendment
doctrine.....First Amendment doctrine reflects a preference for
strict scrutiny    Beyond the First Amendment context, the
Court's substantive due-process doctrine also employs a form of
strict scrutiny.

118.    Third, strict scrutiny is preferable because this is a
doctrinal area in which the Court has not simply refrained from
suggesting that lesser review is called for but one in which it
has strongly indicated that intermediate scrutiny should not be
employed.

119.    Fourth, and perhaps most importantly, we reject
intermediate scrutiny here because it has no basis in the
Constitution. Both the Court and the academy have said as much.

120.    The Heller Court's reasons for explicitly rejecting
rational-basis scrutiny apply equally to intermediate scrutiny.
The Court rejected rational-basis scrutiny for Second Amendment
challenges because it "is a mode of analysis we have used when

35

evaluating laws under constitutional commands that are
themselves prohibitions on irrational laws," citing Engquist v.
Oregon Department of Agriculture, 553 U.S. 591 (2008), an
employment-discrimination case under the Equal Protection
Clause. Heller, 554 U.S. at 628 n.27 (emphasis added). "In those
cases," the Court said, "'rational basis' is not just the
standard of scrutiny, but the very substance of the
constitutional guarantee." Ibid. (emphasis added). "Obviously,
the same test"—i.e., a scrutiny test imported from Equal
Protection Clause jurisprudence—"could not be used to evaluate
the extent to which a legislature may regulate a specific,
enumerated right, be it the freedom of speech, the guarantee
against double jeopardy, the right to counsel, or the right to
keep and bear arms." Ibid. (emphasis added). The Court
continued: "There may be narrower scope for operation of the
presumption of constitutionality [i.e., narrower than that
provided by rational basis review] when legislation appears on
its face to be within a specific prohibition of the
Constitution, such as those of the first ten amendments . . . ."
Ibid. (quoting United States v. Carolene Prods. Co., 304 U.S.
144, 152 n.4 (1938)) (bracketed material from Heller). Heller's
footnote 27—even aside from the Court's flat rejection of
Justice Breyer's interest-balancing inquiry—strongly suggests
that intermediate scrutiny "could not be used to evaluate"
Second Amendment challenges. Ibid.

121.    Given the above, we prefer strict scrutiny over
intermediate scrutiny..... strict scrutiny.....is more
appropriate for assessing a challenge to an enumerated
constitutional right, especially in light of Heller's rejection
of judicial interest-balancing. See Chovan, 735 F.3d at 1145–46,
1149–52 (Bea, J., concurring) ("Categorical curtailment of
constitutional rights based on an individual's status requires
more rigorous analysis than intermediate scrutiny."); NRA v. ATF
(NRA II), 714 F.3d 334, 336 (5th Cir. 2013) ("[T]he level of
scrutiny required [for the case] must be higher than
[intermediate scrutiny]."); Heller II, 670 F.3d at 1284 ("Even
if it were appropriate to apply one of the levels of scrutiny
after Heller, surely it would be strict scrutiny rather than . .
. intermediate scrutiny

122.    Strict scrutiny demands government interests that are
"compelling" and not "merely" "important." ......it demands that
government regulations be "narrowly tailored" to the interests
and not "merely" "substantially related" to those interests.

123.    a regulation flunks the narrow-tailoring requirement by
being "under inclusive" if "the proffered objectives are not
pursued with respect to analogous . . . conduct."

124.    To be eligible for any grant money, however, Congress
required states to implement a relief-from-disabilities-program
for individuals subject to § 922(g)(4)'s prohibition. See §
103(c), 122 Stat. at 2568. States "shall grant the relief" and

restore the individual's firearm rights if the person is
unlikely to be dangerous. Tyler could apply for relief from a
federally-certified state program, but he cannot obtain relief
from his state program because Michigan has not created one. If
Michigan had a program, Tyler could potentially obtain relief
and regain his Second Amendment right because he is not
dangerous.

125.    Under this scheme, whether Tyler may exercise his right
to bear arms depends on whether his state of residence has
chosen to accept the carrot of federal grant money and has
implemented a relief program. His right thus would turn on
whether his state has taken Congress's inducement to cooperate
with federal authorities in order to avoid losing anti-crime
funding. An individual's ability to exercise a "fundamental
right necessary to our system of ordered liberty," McDonald, 561
U.S. at 778, cannot turn on such a distinction.

116. "Our task is to apply the Constitution and the precedents
of the Supreme Court, regardless of whether the result is one we
agree with as a matter of first principles or policy." Heller
II, 670 F.3d at 1296 (Kavanaugh, J., dissenting).

### JAIME CAETANO v.MASSACHUSETTS
### SUPREME COURT OF THE UNITED STATES

126.    It is settled that the Second Amendment protects an
individual right to keep and bear arms that applies against both

The Supreme Court stated that Second Amendment cases should be handled just like First Amendment cases. Therefore, please consider what your reaction would be if Massachusetts had discretionary case by case statutes governing freedom of speech. What if in Massachusetts your local police chief was the individual empowered to decide which citizens were able to benefit from their First Amendment right to freedom of speech and how much of that right they would be able to exercise? I bet this Honorable Court could rule that scenario unconstitutional without difficulty.

I pray that this Honorable Court finds that Massachusetts' case by case discretionary firearms licensing laws are unconstitutional under the Second Amendment and the Fourteenth Amendment. Additionally, the concept of unsuitability is unconstitutionally vague.

I pray that this Honorable Court finds that the Second Amendment and the Fourteenth Amendment define rights, not privileges, and that police chiefs do not hand out enumerated Constitutional rights.

Respectfully Submitted,

Laurence Brown, Plaintiff, Pro Se          August 28, 2017
20 Virginia Dr.
Bridgewater, MA 02324
508 697 4195
oursite1@hotmail.com

48

curtailment, though there is no proof it would"(MOORE
v.MADIGAN).

"the State needed to make an extremely strong showing that
its law furthered public safety."

"To carry its burden, the City must establish a "close
fit"...and the actual public interests it serves, and prove that
the public's interests are strong enough to justify "so
substantial an encumbrance on individual Second Amendment
rights" (ILLINOIS ASSOCIATION OF FIREARMS RETAILERS v. CITY OF
CHICAGO).

Additionally, the Supreme Court in Heller clearly
prohibited the practice of case-by-case discretionary licensing
decisions: "We know of no other enumerated constitutional right
whose core protection has been subjected to a freestanding
"interest-balancing" approach. The very enumeration of the right
takes out of the hands of government—even the Third Branch of
Government—the power to decide on a case-by-case basis whether
the right is really worth insisting upon. A constitutional
guarantee subject to future judges' assessments of its
usefulness is no constitutional guarantee at all. Constitutional
rights are enshrined with the scope they were understood to have
when the people adopted them, whether or not future legislatures
or (yes) even future judges think that scope too broad."

family, and property is most acute would fail constitutional
muster. ... and is hence unconstitutional. It is no answer to
say, as petitioners do, that it is permissible to ban the
possession of handguns so long as the possession of other
firearms (i.e., long guns) is allowed."

Delmonte's discretionary decision to call me an unsuitable
person can absolutely prevent me from having any firearms in my
home. Even if Delmonte continues to allow me to have an FID
card, which he does not have to do under current Massachusetts
law, my Second Amendment rights would still be completely
destroyed. You cannot own a handgun with an FID card and Heller
is all about handguns.

Therefore, Delmonte's case by case discretionary decision
not to allow me to own a handgun does not merely burden my
Second Amendment rights, it completely destroys them.

"A law that under the pretence of regulating, amounts to a
destruction of the right would not pass constitutional muster
under any of the standards of scrutiny that we have applied to
enumerated constitutional rights. A law effecting a destruction
of the right rather than merely burdening it is, after all, an
infringement under any light."(HELLER & PERUTA)

"so substantial a curtailment of the right of armed self-
defense requires a greater showing of justification than merely
that the public might benefit on balance from such a

143. All of the above constitutionally allowed examples of laws regulating firearms affect every Massachusetts resident the same way regardless of the town or city they reside in, equal treatment under the law. No discretion or case-by-case business is involved. However, this excerpt from Heller clearly does NOT mean that Massachusetts' current case-by-case discretionary firearms licensing law is constitutional.

## Relief

Heller states: "There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms...the right secured...was by the time of the founding understood to be an individual right protecting against both public and private violence.

The Second Amendment protects an individual right to possess a firearm unconnected with service in a militia, and to use that arm for traditionally lawful purposes, such as self-defense within the home.

The District's total ban on handgun possession in the home amounts to a prohibition on an entire class of "arms" that Americans overwhelmingly choose for the lawful purpose of self-defense. Under any of the standards of scrutiny the Court has applied to enumerated constitutional rights, this prohibition—in the place where the importance of the lawful defense of self,

45

Amendment or state analogues. The Court's opinion should not be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. *Miller's* holding that the sorts of weapons protected are those "in common use at the time" finds support in the historical tradition of prohibiting the carrying of dangerous and unusual weapons."

142. What does this really mean? It means that The Commonwealth Of Massachusetts can make laws requiring a license to carry firearms, laws that require that background checks be performed and passed before that license can be issued, laws that require that a course in safe firearms handling must be taken and passed before that license can be issued, laws that specify either or both concealed carry or open carry, laws that require this license before firearms and ammunition can be purchased and laws prohibiting firearms that are not in common use. The Commonwealth Of Massachusetts can make a law stating that providing false information on a firearms license application will result in the application being denied. (Hightower v. City Of Boston: Hightower's license was not revoked because of a general finding that she was not "suitable," but rather because of a particular determination that she "completed the application form untruthfully.")

individual rights were not a check on government power, then they would serve no purpose, an absurd outcome. *See McDonald*, 561 U.S. at 769 (noting that the framers of the U.S. Constitution and their opponents both agreed that the "right to bear arms was fundamental to the newly formed system of government," but that "those who were fearful that the new Federal Government would infringe traditional rights such as the right to keep and bear arms insisted on the adoption of the Bill of Rights as a condition for ratification of the Constitution"); *see Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 569 (1985) (Powell, J., dissenting) ("So strong was the concern that the proposed Constitution was seriously defective without a specific bill of rights . . . that in order to secure the votes for ratification, the Federalists eventually conceded that such provisions were necessary.")

### An Offen Used Misinterpretation Of Heller

141. In my opinion Heller doesn't require interpretation, it's very clear. However, some defendants in Second Amendment cases often try to justify unconstitutional laws by intentionally misinterpreting the following excerpt from Heller:

"Like most rights, the Second Amendment right is not unlimited. It is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose: For example, concealed weapons prohibitions have been upheld under the

43

137. "The right to self-defense is largely meaningless if it does not include the right to choose the most effective means of defending oneself." Friedman, 784 F.3d at 418 (Manion, J., dissenting); see id. at 413 ("The ultimate decision for what constitutes the most effective means of defending one's home, family, and property resides in individual citizens and not the government.

138. The Equal Protection Clause guarantees that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.13...the Equal Protection Clause is designed to "keep governmental decision makers from treating differently persons who are in all relevant respects alike." Nordlinger v. Hahn, 505 U.S. 1, 10 (1992).

## RADICH v. GUERRERO & LARSON UNITED STATES DISTRICT COURT FOR THE NORTHERN MARIANA ISLANDS

139. The Second Amendment, made applicable against the states through the Fourteenth Amendment, protects the fundamental right of armed self-defense... The Equal Protection Clause prohibits discrimination against suspect classes of individuals, including lawful permanent residents, without a legitimate state interest as justification.

140. ...a government's authority to act is limited by its duty not to violate individual rights... The reason is obvious: if

42

132.    The Supreme Court has already performed an historical
analysis of our traditional understanding of a citizen's right
to keep a weapon at home for self-defense, concluding that "the
right of law-abiding, responsible citizens to use arms in
defense of hearth and home" lies at the core of the Second
Amendment. Heller, 554 U.S. at 635. Any prohibition or
restriction imposed by the government on the exercise of this
right in the home clearly implicates conduct protected by the
Second Amendment.

133.    The strict-scrutiny standard requires the government to
prove its restriction is "narrowly tailored to achieve a
compelling governmental interest"...To be narrowly tailored, the
law must employ the least restrictive means to achieve the
compelling government interest.

134.    In Chester, we adopted a First-Amendment-like approach to
determining the appropriate level of scrutiny to apply to any
given Second Amendment challenge.

135.    "Nothing in our decision in Heller suggested that a law
must rise to the level of the absolute prohibition at issue in
that case to constitute a 'substantial burden' on the core of
the Second Amendment right.").

136.    "It is no answer to say, as petitioners do, that it is
permissible to ban the possession of handguns so long as the
possession of other firearms (i.e., long guns) is allowed.")

41

130.    we fashioned a two-part approach to resolving Second

Amendment challenges, see 628 F.3d 673, 680 (4th Cir. 2010),

much like the approach adopted by several of our sister

circuits...First, we ask "whether the challenged law imposes a

burden on conduct falling within the scope of the Second

Amendment's guarantee"..."if the challenged regulation burdens

conduct that was within the scope of the Second Amendment as

historically understood, then we move to the second step of

applying an appropriate form of means-end scrutiny"... "any law

that would burden the 'fundamental,' core right of self-defense

in the home by a law-abiding citizen would be subject to strict

scrutiny.

131.    Heller affirmed that the Second Amendment protects a

preexisting "individual right to possess and carry weapons in

case of confrontation." 554 U.S. at 592. "Deeply rooted in this

Nation's history and tradition," McDonald, 561 U.S. at 768

(internal quotation marks omitted), this right is among the

"fundamental rights necessary to our system of ordered liberty,"

id. at 778. The right to keep and bear arms historically has

been understood to encompass "self-defense and hunting," Heller,

554 U.S. at 599, but Heller made clear "the central component of

the Second Amendment right" is "individual self-defense,"

McDonald, 561 U.S. at 767.

the Federal Government and the States. That right vindicates the
"basic right" of "individual self-defense."

127.   the Second Amendment accordingly guarantees the right to
carry weapons "typically possessed by law-abiding citizens for
lawful purposes,"

128.   The lower court's ill treatment of *Heller* cannot stand.
The reasoning of the Massachusetts court poses a grave threat to
the fundamental right of self-defense. ...the right to bear
other weapons is "no answer" to a ban on the possession of
protected arms.

## KOLBE v. HOGAN
## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

129.   Maryland law implicates the core protection of the Second
Amendment—"the right of law-abiding responsible citizens to use
arms in defense of hearth and home," District of Columbia v.
Heller, 554 U.S. 570, 635 (2008), and we are compelled by Heller
and McDonald v. City of Chicago, 561 U.S. 742 (2010), as well as
our own precedent in the wake of these decisions, to conclude
that the burden is substantial and strict scrutiny is the
applicable standard of review for Plaintiffs' Second Amendment
claim...We are not a rubber stamp. We require strict scrutiny
here not because it aligns with our personal policy preferences
but because we believe it is compelled by the law set out in
Heller and Chester.